UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, f/b/o       *
LIBERTY ROOFING COMPANY               *
                                      *
        Plaintiff,                    *
                                      *
    v.                                *
                                      *
THE HASKELL COMPANY,                  *       Civil Action No. 20-cv-10419-ADB
TRAVELERS CASUALTY AND SURETY         *
COMPANY OF AMERICA, and               *
FIDELTY AND DEPOSIT COMPANY OF        *
MARYLAND/ZURICH AMERICAN              *
INSURANCE COMPANY,                    *
                                      *
        Defendants.                   *

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

This dispute arises out of an agreement between Plaintiff Liberty Roofing Company ("Liberty") and Defendant The Haskell Company ("Haskell") concerning a construction project on a United States Coast Guard ("Coast Guard") base at Woods Hole, Massachusetts.  [ECF No. 1].  On February 18, 2021, an Arbitrator issued an interim award (the "Interim Award") resolving several claims in favor of Haskell and awarding it $248,837.59.  [ECF No. 15-4 at 13–14].  The Arbitrator then issued a final award (the "Award") on April 15, 2021, which incorporated all of the findings and conclusions set forth in the Interim Award and also granted Haskell attorneys' fees and costs, for a total award of $512,344.59.  [ECF No. 15-5].  Liberty now moves the Court to vacate the Award.  [ECF No. 15].  Haskell, along with Defendants Travelers Casualty and Surety Company of America and Fidelity and Deposit Company of Maryland/Zurich American Insurance Company (collectively, "Defendants"), responded with a cross-motion asking the Court to confirm the Award, enter final judgment, and dismiss the case.

[ECF No. 16].  For the reasons set forth below, Liberty's motion to vacate the Award, [ECF No. 15], is <u>DENIED</u>, Defendants' motion to confirm the Award and enter final judgment, [ECF No. 16], is <u>GRANTED</u>, and Defendants' request for additional attorneys' fees and costs incurred in responding to Liberty's motion, [ECF No. 19], is <u>DENIED</u>.

## I.    BACKGROUND

### A.    Factual Background

The following facts are taken from the parties' submissions and the documents cited therein.

#### 1.    The Subcontract Agreement and Woods Hole Project

Pursuant to a contract with the Coast Guard, Haskell was tasked with constructing three buildings (the ANT Building, Station Building, and Guardhouse) at a military base in Woods Hole, Massachusetts.  [ECF No. 15-5 at 9].  On or around February 26, 2018, Haskell engaged Liberty as a subcontractor to, among other things, perform sheet metal roofing work for the Woods Hole project (the "Subcontract Agreement").  [<u>Id.</u>; ECF No. 15-2 at 3].  Under the Subcontract Agreement, Liberty agreed to

> provide sufficient resources to accomplish the Scope of Work within the time frame set forth in the Progress Schedule.  The most current version of this schedule shall be considered the updated Progress Schedule.  It will be the only basis for the performance of the Work and for the establishment of intermediate milestone dates and completion dates.

> Near term schedules will be created by Haskell and will be issued at the weekly subcontractor's meeting.  [Liberty's] attendance at this meeting is mandatory. Persons attending the progress meeting must be able to address all manpower and material issues regarding this project, including the authority to direct overtime as required to meet these schedule requirements.  Unless written notice of any objection to the schedule and its subsequent updates is provided within five (5) business days of receipt of said updates, the schedule and its updates will be considered acceptable to [Liberty][.]

[ECF No. 15-2 at 10].  As part of the roof installation, Liberty was required to install an "underlayment," which is a product that is adhered over the roofing insulation to protect it from water damage.  [Id. at 3; ECF No. 15-1 at 2].  The metal seam roof would then be installed over the insulation and underlayment.  [ECF No. 15-2 at 3; ECF No. 15-1 at 2].

By the fall of 2018, Liberty had installed the underlayment on all three buildings and begun installing the sheet metal roof on the ANT Building.  [ECF No. 15-1 at 2–3].  Eventually, the Coast Guard issued a stop work order because a portion of the sheet metal roof that Liberty had installed did not meet the wind uplift requirements that were structurally necessary.  [ECF No. 15-5 at 10].  Haskell directed Liberty to stop work on the project until the roof could be re-engineered.  [ECF No. 15-1 at 3; ECF No. 19 at 2].  On December 3, 2018, Liberty and Haskell entered into a Subcontract Modification ("Mod. D"), whereby Haskell agreed to pay Liberty an additional amount to remove, redesign, and reinstall the sheet metal roof on the Ant Building with one that met the relevant requirements.  [ECF No. 15-3 at 2; ECF No. 15-5 at 11]. [1]  Mod. D also states that "[a]ll terms and conditions of the previous Subcontract Agreement not modified herein shall remain in full force and effect."  [ECF No. 15-3 at 2].  While the new roof was being engineered, Liberty represents that the underlayment that Liberty had installed on all three buildings continued to be exposed to the elements.  [ECF No. 15-1 at 3–4].

Liberty continued with reinstallation of the roof until Haskell terminated their relationship in March 2019 after Liberty had failed to meet project deadlines.  [ECF No. 15-5 at 12].  Prior to the termination, in January 2019, Haskell had issued Liberty a Notice to Cure, "indicating that [Liberty] was not using sufficient manpower to stay current with the Project

---

[1] The parties continue to dispute who is responsible for the faulty roof design.  The Arbitrator considered the issue resolved with the adoption of Mod. D.  [ECF No. 15-5 at 11–12].

schedule." [Id. at 13].  Liberty claims that the delay caused by the roof redesign required it to operate under winter conditions that were unanticipated in the original project schedule, causing even further delays.  [Id. at 13 n.3].

        2.      The Arbitration

Although Liberty initially filed suit in this Court, [ECF No. 1], the parties proceeded to arbitration in December 2020 pursuant to an arbitration clause in the Subcontractor Agreement, [ECF No. 15-5 at 2; ECF No. 4].  In the arbitration, Liberty argued that it was wrongfully terminated and sought payment for labor and materials in connection with its work on the Woods Hole project.  [ECF No. 15-5 at 9; ECF No. 15-1 at 4; ECF No. 19 at 3].  Haskell asserted counterclaims stemming from Liberty's allegedly defective performance and seeking the costs associated with that defective performance.  [ECF No. 15-5 at 9; ECF No. 15-1 at 4; ECF No. 19 at 3].  The parties jointly selected the Arbitrator, participated in five days of hearings where they presented testimony and exhibits, and submitted post-hearing briefing.  [ECF No. 15-5 at 8].  The Arbitrator issued his Interim Award, finding that Liberty had breached its contract with Haskell and awarding Liberty $0.00 and Haskell $248,837.59.  [Id. at 19].

In relevant part, the Arbitrator made three findings in his Interim Award in support of his conclusion that Liberty had breached its obligations and that an award should be issued in favor of Haskell.  First, that Liberty "failed to advance the work after December 3, 2018 in a timely manner[,]" "provided inadequate manpower to the Project[,] and failed to meet scheduled durations."  [ECF No. 15-5 at 13].  In support of this finding, the Arbitrator dismissed Liberty's argument that winter weather caused the delay and concluded that Liberty "knew that the work would be performed in winter conditions" when Mod. D was signed and "agreed to the price and schedule and had the obligation to provide the manpower to perform the work as agreed."  [Id. at

13 n.3].  Second, that, pursuant to Mod. D, Liberty had agreed to "reinstall the ANT metal roof, in accordance with manufacturer's requirements" which included that "the underlayment be installed and in required condition."  [Id. at 13, 15].  Third, Liberty was responsible for maintaining the underlayment during the work stoppage and the post-December 3, 2018 reinstallation process.  [Id. at 15].

The Interim Award left the issue of attorneys' fees and costs unsettled, and, after reviewing additional submissions, the Arbitrator issued the Award, which incorporated all of the Interim Award's findings and granted Haskell an additional $263,507.00 in attorneys' fees, for a total award of $512,344.59.  [ECF No. 15-5 at 7].

### B.   Procedural History

On March 2, 2020, Liberty filed its complaint alleging breach of contract and quantum meruit against Defendants.  [ECF No. 1].  The parties then jointly moved to stay the action pending arbitration proceedings, [ECF No. 4], which the Court granted, [ECF. No. 6].  The Award was issued on April 15, 2021, and Liberty moved to vacate it on May 7, 2021.  [ECF. No 15 at 1].  Defendants filed their cross-motion to confirm the Award on May 10, 2021, [ECF No. 16], and opposed the motion to vacate on May 21, 2021, [ECF No. 19].  Liberty filed its opposition to the motion to confirm on May 11, 2021.  [ECF No. 17].  The Court lifted the stay on May 12, 2021.  [ECF No. 18].

## II.   LEGAL STANDARD

The parties bring their motions pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA").  "[A] federal court's authority to defenestrate an arbitration award is extremely limited."  Hoolahan v. IBC Advanced Alloys Corp., 947 F.3d 101, 111 (1st Cir. 2020) (internal quotation marks and citations omitted); see also Teamsters Local Union No. 42 v. Supervalu,

Inc., 212 F.3d 59, 61 (1st Cir 2000) ("[D]isputes that are committed by contract to the arbitral

process are almost always won or lost before the arbitrator.  Successful court challenges are few

and far between.").  The Court "do[es] not sit as a court of appeal to hear claims of factual or

legal error by an arbitrator or to consider the merits of the award."  Hoolahan, 947 F.3d at 111

(citations omitted).  A court will not disturb the award as long as it "draw[s] its essence from the

Agreement that underlies the arbitration proceeding, and the arbitrator arguably constru[ed] or

appl[ied] . . . the [Agreement] within the scope of [his] authority."  Id. (internal quotations marks

and citations omitted).

Even though this Court's review of an arbitral award is narrow, §10(a) of the FAA

enumerates limited, specific grounds for vacating an award that "has been tainted in certain

specific ways."  Advest, Inc. v. McCarthy, 914 F.2d 6, 9 (1st Cir. 1990).  Specifically, §10(a)

provides that a court may vacate an award:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of
> them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the
> hearing, upon sufficient cause shown, or in refusing to hearing evidence pertinent
> and material to the controversy; or of any other misbehavior by which the rights of
> any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them
> that a mutual, final, and definite award upon the subject matter submitted was not
> made.

9 U.S.C. § 10(a).

Beyond the limited grounds enumerated in §10(a), courts also retain an inherent power to

vacate arbitral awards made in "'manifest disregard of the law.'"  Hoolahan, 947 F.3d at 111

(quoting Advest, 914 F.2d at 8–10 & nn.5, 6).[2]  Under this doctrine, an award may be vacated if

---

[2] The First Circuit recognized that this non-statutory ground for vacating an award "is in
question" based on Supreme Court precedent, but it "'has avoided answering the question and

it is "'(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact.'" Id. at 119 (quoting Mt. Valley Prop., Inc. v. Applied Risk Servs., Inc., 863 F.3d 90, 95 (1st Cir. 2017)).  Nevertheless, this ground for review is "very limited and narrow." Id. at 111.

## III.    DISCUSSION

Liberty contends that the Award should be vacated because the Arbitrator both exceeded his authority in violation of §10(a)(4) and acted in manifest disregard of the law when he ignored the plain language of the agreements with Haskell and instead relied on contractual provisions that did not exist.  [ECF No. 15-1 at 5–7].  Liberty specifically challenges the Arbitrator's findings regarding the obligations established by the Mod. D agreement, namely 1) the existence of project schedules and 2) the obligation to maintain and reinstall the underlayment during the re-roofing process.  [Id. at 7–8, 11–13; ECF No. 19 at 9].

### A.    Project Schedules

Liberty contends that the Arbitrator "exceeded his powers" by misinterpreting and ignoring the plain language of Mod. D when concluding that it contained a schedule provision that could be breached.  [ECF No. 15-1 at 7–10].  Liberty argues that because Mod. D did not include any such schedule, the Arbitrator erred in concluding that (1) Liberty agreed to a schedule and (2) that "[t]he record and competent evidence in this matter supports the conclusion

---

instead has assumed its continued application when no manifest disregard of the law [has] occurred.'" Hoolahan, 947 F.3d at 111 n. 14 (quoting Dialysis Access Ctr.,LLC, v. RMS Lifeline, Inc., 932 F.3d 1, 13 n.13 (1st Cir. 2019)).  Because the Court finds that, even assuming this doctrine remains a valid ground for vacating award, the Arbitrator did not act in manifest disregard of the law, the Court declines to analyze the continuing applicability of this doctrine.

that [] [Liberty] failed to advance the work after December 3, 2018 in a timely manner."  [ECF No. 15-1 at 8].

As the First Circuit recently reiterated in the context of a § 10(a)(4) challenge, "[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."  Hoolahan, 947 F.3d at 118 (internal quotation marks and citations omitted); see also United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987) ("The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.").  Instead, a "court may overturn a decision 'only if the arbitrator acts outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract."  Hoolahan, 947 F.3d at 118 (quoting Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 (2013) (internal quotation marks and citation omitted)).

Here, the Arbitrator's conclusion and interpretation of Liberty's scheduling obligations is drawn from the essence of the contract and supported by the Award's factual findings.  First, no party argues that the Arbitrator did not have the authority to decide the issue of whether Liberty was properly terminated from the Woods Hole project, and in fact, this was the specific issue presented to the Arbitrator.  [ECF No. 15-5 at 9].  Second, the Arbitrator made explicit factual findings in the Award that, based on the record before him, schedules did exist and the "[c]ontract schedules for [Liberty's] work indicated a three-week installation period for the ANT building sheet metal roofing panels, followed by three weeks for the Station Building panels and two weeks for the Guard House panels."  [ECF No. 15-5 at 10].  From this language, it is clear

that he considered the agreements between the parties and interpreted them in determining that Liberty breached its obligations.  Finally, even though schedules are not explicitly mentioned in Mod. D, Liberty points to nothing in Mod. D that suggests that the existence of project schedules would contradict its plain language.  In fact, there is no dispute that expectations regarding the work schedule were repeatedly referenced in the Subcontract Agreement, see, e.g., [ECF No. 16-2 at 7, 10, 12–13], and although Mod. D did not explicitly reference project schedules, it did provide that "[a]ll terms and conditions of the previous Subcontract Agreement not modified herein shall remain in full force and effect."  [ECF No. 15-3 at 2].  In sum, the Arbitrator's interpretation of Liberty's obligations was entirely plausible and supported by his factual findings, and Liberty has failed to demonstrate that he was "issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract." Hoolahan, 947 F.3d at 118 (internal quotation marks and citations omitted).  The language of the Award "makes manifest that the [A]rbitrator[] pondered the pertinent language of the Agreement and construed that language in accordance with the parties' discernible intent.  That is contract interpretation, pure and simple" and not a basis for vacating the Award.  Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 34 (1st Cir. 2006).

Although it appears to be styled as a challenge under § 10(a)(4), to the extent that Liberty argues that the Arbitrator's conclusion regarding schedules violated the manifest disregard of law doctrine because it ignored the plain language of the agreements between the parties, its argument also fails.  For the reasons set forth above, the plain language of the Subcontract Agreement and Mod. D, when combined with the Arbitrator's factual findings, "easily sustains the interpretation upon which the [A]ward rests."  Cytyc, 439 F.3d at 34.  There is nothing in

Mod. D that is explicitly contradicted by a finding that Liberty was bound to timely perform work and provide sufficient manpower.

Liberty also argues that to the extent there were schedules it was supposed to follow, they were not feasible, "bore no rational basis to the work being performed," and "were a moving target." [ECF No. 15-1 at 8]. At its core, Liberty is asking the Court to reweigh the evidence presented to the Arbitrator to find that it could not possibly be held to Haskell's schedules. This is not the Court's role at this juncture. The parties had ample opportunity to present detailed evidence, exhibits, and argument before the Arbitrator over a five-day period. A court's review of an arbitral award does not involve relitigating factual issues already decided at arbitration, Hoolahan, 947 F.3d at 111 (citations omitted), and the Court must uphold an arbitral "decision as long as [the Arbitrator was] even 'arguably' construing the Agreement," Cytyc, 439 F.3d at 33 (quoting United Paperworkers Int'l Union, 484 U.S. at 38). Again, that standard is clearly met here. Thus, Liberty has failed to demonstrate that the Arbitrator exceeded his authority or acted in manifest disregard of the law when determining that Liberty breached its obligations regarding the project's schedules.

### B.      Requirement that Liberty Maintain and Reinstall the Underlayment

Liberty also argues that the Arbitrator exceeded his authority and acted in manifest disregard of the law by establishing contractual obligations regarding the underlayment that do not exist. [ECF No. 15-1 at 10–14]. Specifically, Liberty takes issue with the Arbitrator's conclusions that Mod. D required Liberty to maintain the roof underlayment, even though the project was delayed many months, and to reinstall the underlayments while reinstalling the ANT Building roof. [Id.]. Liberty asserts that "Mod. D does not contain any reference to underlayment . . . [and thus] Liberty was not in any way responsible for [it]." [Id. at 11]. Once

again, however, the Court concludes that the Arbitrator's factual findings draw their essence

from the agreements between the parties and do not contradict their plain language.  In the

Award, the Arbitrator concluded that

> [n]othing in Mod. D or in the record generally suggests that Claimant was excused
> from 1) maintaining the roof membranes during the post-December 3, 201[8] time
> period, or 2) installing the ANT roof after December 3, 2018 in full accord with
> manufacturer's recommended practices, which includes placement of the metal
> roof over a substrate that complied with the manufacturer's recommendations.

[ECF No. 15-5 at 15].  The Arbitrator explicitly stated that he looked to the "record" and the

language of Mod. D to reach this determination.  Though Liberty thinks he was wrong, it has

again failed to explain how an award that clearly states it was based on an interpretation of the

agreement did not draw its essence from the agreement.  Further, the fact that Mod. D does not

mention the term "underlayment" does not in itself demonstrate that the only proper

interpretation of the agreements between the parties is that Liberty was completely excused from

maintaining the installed underlayments or reinstalling them.  The Court cannot properly disturb

a finding that more than arguably drew its essence from the parties' agreements.  See Hoolahan,

947 F.3d at 111.

Liberty also appears to assert that two provisions of the Subcontract Agreement show that

the Arbitrator's findings "were contrary to the plain terms of the agreement" and thus a manifest

disregard of the law.  First, it notes that the Subcontract Agreement excluded responsibility for

"uplift damage to the roof system due to weather conditions . . . ."  [ECF No. 15-1 at 10; ECF

No. 15-2 at 4].  The Arbitrator, however, specifically considered this provision and found that

the facts precluded the application of the clause because Liberty "did not establish that the

instances of water damage [to the underlayment membrane] were caused by wind uplift issues."

[ECF No. 15-5 at 15].  Second, Liberty argues that "[a]ny responsibility to protect the work is

clearly stricken from the contract," [ECF No. 15-1 at 11], but a review of the cited provision that

was stricken demonstrates that it is inapplicable to this situation.  The stricken provision states that "[Liberty] shall protect its finished Work against damage by other trades and shall be liable for damage caused by it to the Work of others."  [ECF No. 16-2 at 23 ¶ 24(a) (strikethrough omitted)].  The issue here does not relate to damage by other trades, nor would bare underlayment absent metal roof panels likely qualify as finished work.  Neither of the above provisions suggests the Arbitrator exceeded his authority or acted in manifest disregard of the law.  See Hoolahan, 947 F.3d at 111.

Finally, Liberty makes a number of additional arguments to suggest that it could not possibly have been responsible for maintaining or reinstalling the underlayment, including that: (1) it "could not be held responsible for protecting work during a shutdown because there could be no end," [ECF No. 15-1 at 11]; (2) it could not have agreed to be responsible for the underlayment where "[the] product warranty expired two (2) days after Mod. D was executed," [id.]; and (3) Haskell contracted with another company to work on the underlayment after Liberty declined to do so, [id. at 12].  Overall, although such arguments of practicality could have informed the Arbitrator's assessment of the parties' intent as part of his more extensive fact-finding and hearing process, the Arbitrator did not exceed his authority or contradict plain contractual language in finding that Liberty was obliged to maintain and reinstall the underlayment, even in light of the circumstances surrounding the Woods Hole project.

In sum, Liberty has failed to show that the Arbitrator exceeded his authority or acted in manifest disregard of law.  Its motion to vacate the Award is therefore DENIED.

## IV.      DEFENDANTS' MOTION TO CONFIRM THE AWARD

On May 10, 2021, three days after Liberty moved to vacate it, Defendants asked the Court to confirm the Award, [ECF No. 16], and Liberty opposed the motion because, at that time, its motion to vacate was pending, [ECF No. 17 at 2].  Section 9 of the FAA provides that

> at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9.  Because Defendants timely moved to confirm the Award and Liberty's motion to vacate has been denied, the motion to confirm the Award is <u>GRANTED</u>.

## V.      DEFENDANTS' REQUEST FOR ATTORNEYS' FEES AND COSTS IN RESPONSE TO LIBERTY'S MOTION TO VACATE

Though not set out in a separate motion, Defendants also request an award of attorneys' fees and costs incurred in responding to Liberty's motion to vacate.  [ECF No. 19 at 15]. Defendants argue that Liberty's challenge to the Award was frivolous and that courts have the authority to award attorneys' fees when a party challenges an award "without justification." [<u>Id.</u>].  Assuming that the Court has the authority to award fees and costs for frivolous challenges to an arbitral award, that standard is not met here.  Liberty was justified in pursuing certain arguments, even though it was unsuccessful, given the narrow grounds for review.  Further, Defendants' motion also fails to provide a sufficient evidentiary basis for any potential award. <u>See, e.g.</u>, <u>W. Mass. Elec. Co. v. Int'l Bhd. of Elec. Workers, Local 455</u>, 11-cv-30106, 2012 WL 4482343, at *9 (D. Mass Sept. 27, 2012) (denying claim for attorneys' fees where defendant failed to properly support its motion).  Therefore, Defendants' request is <u>DENIED</u>.

**VI.      CONCLUSION**

Accordingly, Liberty's motion to vacate the Award, [ECF No. 15], is <u>DENIED</u>.

Defendants' motion to confirm the Award and enter final judgment, [ECF No. 16], is

<u>GRANTED</u>.  Defendants' request for additional attorneys' fees and costs, [ECF No. 19], is

<u>DENIED</u>.  The Clerk shall enter final judgment awarding Defendants $512,344.59 plus post-

judgment interest.

**SO ORDERED.**

March 14, 2022                                             /s/ Allison D. Burroughs
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE